**Case No. ___**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

CHEX SYSTEMS, INC.,

Defendant-Petitioner,

v.

SHARON K. RIDDICK,
on behalf of herself and all others similarly situated,

Plaintiff-Respondent,

---

On Appeal from the United States District Court for the
Eastern District of Virginia, Norfolk Division, No. 2:24-cv-700

---

# DEFENDANT'S PETITION FOR LEAVE TO APPEAL CLASS CERTIFICATION ORDER PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)

---

David M. Gettings
John C. Lynch
Kathleen M. Hutchenreuther
TROUTMAN PEPPER LOCKE LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510

*Counsel for Defendant-Petitioner Chex Systems, Inc.*

October 14, 2026

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __________ Caption: Sharon K. Riddick v. Chex Systems, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Chex Systems, Inc.
(name of party/amicus)

______________________________________________

who is Petitioner, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☑ YES ☐ NO
If yes, identify all parent corporations, including all generations of parent corporations:

Chex Systems, Inc. is wholly owned by eFunds Corporation.

eFunds Corporation is a wholly owned subsidiary of Fidelity National Information Services, Inc. which trades under the symbol "FIS."

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☑ YES ☐ NO
If yes, identify all such owners:

The Vanguard Group holds 10% or more of FIS' stock.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David M. Gettings Date: October 14, 2026

Counsel for: Chex Systems, Inc.



Print to PDF for Filing

## TABLE OF CONTENTS


Page

I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 4

A. Plaintiff's Bankruptcy and ChexSystems' Report ........ 4

B. Class Data Sample ........ 6

C. Procedural Background ........ 6

III. QUESTIONS PRESENTED ........ 7

IV. STANDARD OF REVIEW ........ 8

V. REASONS TO GRANT THE PETITION ........ 8

A. The court ignored the Fourth Circuit's mandate that an FCRA plaintiff must show "objectively and readily verifiable" inaccuracy, which created manifest error in its predominance and typicality analysis. ........ 8

1. Whether it was objectively and readily verifiable that each class member's account debt was discharged is a core individualized issue. ........ 9

2. The requirement that an inaccuracy be objectively and readily verifiable also renders Plaintiff atypical. ........ 12

B. The court manifestly erred in finding predominance when it relied on an overly generalized characterization of ChexSystems' policies. ........ 14

C. The court manifestly erred in finding Plaintiff and class members had standing despite no evidence that any consumer report recipient read a report and understood its defamatory significance. ........ 17

# TABLE OF CONTENTS
(continued)

**Page**


D. The court manifestly erred in finding the class ascertainable based on an unperformed expert methodology and despite Jaffe conceding his methodology did not find the defined class. ............... 19

1. The court certified a class that Jaffe's methodology was not designed to identify. ........................................ 19

2. The court violated *Sardis* by crediting analytical steps Jaffe never performed. ........................................ 20

3. Without a reliable identification method, the class is not ascertainable. ........................................ 22

VI. CONCLUSION ........................................ 23

CERTIFICATE OF COMPLIANCE ........................................ 24

CERTIFICATE OF SERVICE ........................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. U.S. Dep't of Hous. & Urb. Dev.*,
554 F.3d 525 (5th Cir. 2008) ....................7

*Butler v. Trans Union, LLC*,
No. 24 C 211, 2025 WL 2767016 (N.D. Ill. Sept. 29, 2025) ....................15

*Childress v. Experian Info. Sols., Inc.*,
790 F.3d 745 (7th Cir. 2015) ....................10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)....................19

*Davis v. Capital One, N.A.*,
No. 24-1507, 2025 WL 2445880 (4th Cir. Aug. 26, 2025)....................21

*Deiter v. Microsoft Corp.*,
436 F.3d 461 (4th Cir. 2006) ....................14

*Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*,
95 F.4th 181 (4th Cir. 2024) ....................19

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ....................8, 20, 22

*Fernandez v. RentGrow, Inc.*,
116 F.4th 288 (4th Cir. 2024) ....................3, 17, 18

*Hammoud v. Equifax Info. Servs., LLC*,
52 F.4th 669 (6th Cir. 2022) ....................9

*Holden v. Holiday Inn Club Vacations Inc.*,
98 F.4th 1359 (11th Cir. 2024) ....................9

*Jianqing Wu v. Trans Union*,
No. CIVA AW-03-1290, 2006 WL 4729755 (D. Md. May 2, 2006),
*aff'd sub nom. Jianqing Wu v. Equifax*, 219 F. App'x 320 (4th Cir. 2007) .......15

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Lienhart v. Dryvit Sys., Inc.*,
255 F.3d 138 (4th Cir. 2001) ....................4, 8

*Lyons v. PNC Bank, N.A.*,
No. CV SAG-20-02234, 2026 WL 364308 (D. Md. Feb. 10, 2026)....................7

*Mader v. Experian Info. Sols., Inc.*,
56 F.4th 264 (2d Cir. 2023) ....................11

*Marriott Int'l, Inc. v. Accenture LLP*,
78 F.4th 677 (4th Cir. 2023) ....................13

*Overby v. Anheuser-Busch, LLC*,
178 F.4th 175 (4th Cir. 2026) ....................2, 14, 15, 16

*Roberts v. Carter-Young, Inc.*,
131 F.4th 241 (4th Cir. 2025) ....................2, 8, 9, 10

*Rydholm v. Equifax Info. Servs. LLC*,
44 F.4th 1105 (8th Cir. 2022) ....................9

*Sardis v. Overhead Door Corporation*,
10 F.4th 268 (4th Cir. 2021) ....................3, 19, 20, 21

*Scroggins v. LexisNexis Risk Sols. FL Inc.*,
No. 3:22CV545, 2025 WL 3216323 (E.D. Va. Mar. 30, 2025) ....................7

*Stafford v. Bojangles' Rests., Inc*,
123 F.4th 671 (4th Cir. 2024) ....................15, 17

*Sykes v. Experian Info. Sols., Inc.*,
183 F.4th 904 (7th Cir. 2026) ....................11

*Taggart v. Lorenzen*,
587 U.S. 554 (2019)....................11

*Ward v. Nat'l Credit Sys., Inc.*,
182 F.4th 918 (10th Cir. 2026) ....................8

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Wright v. Experian Info. Solutions, Inc.*,
805 F.3d 1232 (10th Cir. 2015) ....................15

**Statutes**

15 U.S.C. § 1681e(b) ....................2, 8, 14

15 U.S.C. § 1681n....................14

**Other Authorities**

Federal Rule of Civil Procedure 23 ....................*passim*

Federal Rule of Evidence Rule 702 ....................21

## I. INTRODUCTION

Plaintiff, Sharon Riddick, brought a nationwide class action against Chex Systems, Inc. ("ChexSystems"), a consumer reporting agency ("CRA"), for allegedly including accounts on consumer reports that have been discharged in bankruptcy. Plaintiff alleges that before issuing each report, ChexSystems must contact third-party data sources to obtain information from bankruptcy dockets, compare those dockets to millions of ChexSystems' account records, and "scrub" these account records to determine which accounts have been discharged. There is no precedent for certifying a Fair Credit Reporting Act ("FCRA") class where assessing liability requires reviewing account records on millions of consumers from thousands of furnishers, pulling individual consumer bankruptcy dockets, having a lawyer review each docket to determine which debts were discharged, and then assessing whether ChexSystems acted reasonably in preparing each consumer's report. Fourth Circuit precedent says this is not a certifiable class.

The district court (the "court") certified it nonetheless. In its Memorandum Opinion, Dkt. 292 ("Mem. Op."), Exhibit 1, the court disregarded recent controlling Fourth Circuit authority at least four separate times. Each time, the court either ignored the authority entirely or mentioned that authority but then flatly diverged from it. And across its opinion, the court failed to conduct the rigorous analysis Rule 23 requires—repeatedly punting Rule 23 issues as premature "merits" questions.

The Court should grant this petition pursuant to Federal Rule of Civil Procedure 23(f) to address the misapplication of Fourth Circuit precedent now.

*First*, Plaintiff alleges a single claim under 15 U.S.C. § 1681e(b) of the FCRA, arguing ChexSystems failed to maintain reasonable procedures to assure maximum possible accuracy by reporting debts from furnishers without preemptively "scrubbing" these debts against every single consumer's bankruptcy docket to determine if the debts are discharged. For each consumer, Plaintiff must prove that ChexSystems' reporting was inaccurate. The Fourth Circuit's seminal decision in *Roberts v. Carter-Young, Inc.* holds that, to be inaccurate in this context, the debt must have been "objectively and readily verifiable" as discharged. 131 F.4th 241, 251 (4th Cir. 2025). The court ignored *Roberts* despite ChexSystems raising it repeatedly, which created profound error in its predominance and typicality analysis.

*Second*, in *Overby v. Anheuser-Busch, LLC*, 178 F.4th 175, 178 (4th Cir. 2026), the Fourth Circuit held a court cannot rely on overly generalized formulations of company policies to certify a class. Doing so wrongly allows a court to brush over material class differences under the guise of a supposedly common policy. The court ignored *Overby*, despite ChexSystems raising it. In doing so, it certified a class based on the supposedly common question of whether ChexSystems must conduct an individualized "scrub" of bankruptcies before preparing a report, while overlooking material differences in the class.

*Third*, in *Fernandez v. RentGrow, Inc.*, 116 F.4th 288 (4th Cir. 2024), the Fourth Circuit held that, to demonstrate Article III standing, a plaintiff must show the recipient of the consumer report "read the misleading information and understood its defamatory significance." *Id.* at 297. The court cited *Fernandez*, but then misconstrued it. The court wrongly interpreted *Fernandez* as only requiring the recipient "review" the report—not review the *inaccurate information* and *understand its defamatory significance*. This is critical. There is no admissible evidence as to Plaintiff or the class that any recipient read the allegedly inaccurate reporting or understood its defamatory significance. In fact, the recipient of Plaintiff's reports, Chartway Federal Credit Union ("Chartway"), confirmed it never denied Plaintiff's application and nothing in the reports would have led to denial. Plaintiff has no standing; nor is there evidence of standing across the class.

*Fourth*, the court relied wholesale on Plaintiff's expert, Jonathan Jaffe, in finding ascertainability. In doing so, the court misapplied Fourth Circuit precedent pertaining to an expert's "fit" and reliability. And, glaringly, the court ignored the Fourth Circuit's guidance in *Sardis v. Overhead Door Corporation*, 10 F.4th 268 (4th Cir. 2021), which confirms the court cannot credit a methodology the expert posits *can* be completed, but has *not actually been carried out*.

This Court should not allow the court's disregard of its controlling precedent to stand. It should use its discretion under Rule 23(f) to take up the case now, rather

than forcing the parties to reach final judgment before the Court considers whether a class should ever have been certified. For reasons of efficiency and fairness, Rule 23(f) petitions ought to be granted whenever the class certification decision "is manifestly erroneous and virtually certain to be reversed on appeal"—as is true here. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 145 (4th Cir. 2001).

## II. STATEMENT OF FACTS

### A. Plaintiff's Bankruptcy and ChexSystems' Report

ChexSystems is a CRA that provides consumer reports to financial institutions when deciding to open new consumer bank accounts. Mem. Op. 1-2, Dkt. 292. The reports include information ChexSystems receives from its bank furnishers regarding a consumer's prior account history with those institutions. Dkt. 110, at 4-5. The reports also include a recommendation, based on the recipient's criteria, as to whether to open that new account. *Id.* at 5.

Before ChexSystems includes information from a furnisher on a report, it puts that furnisher through a rigorous credentialing, contracting, and monitoring process. *Id.* at 5-9. This includes ensuring furnishers have processes to avoid reporting accounts to ChexSystems that have been discharged. *Id.* The undisputed evidence shows these procedures work—with furnishers constantly updating their reporting to ensure they report accurate information—including telling ChexSystems to delete discharged accounts. *Id.* at 7.

Plaintiff initially filed for Chapter 13 bankruptcy, but converted to Chapter 7 on June 17, 2019. *Id.* at 13. She received a Chapter 7 discharge on September 26, 2019. Dkt. 110-13. Plaintiff's discharge order did not include any list of discharged debts; instead, it explained "not all" debts are discharged and "because the law is complicated," the reader "should consult an attorney" regarding "the exact effect of the discharge." *Id.* Plaintiff's bankruptcy listed over two dozen creditors, including SunTrust. *Id.*

In 2024, ChexSystems provided two consumer reports to Chartway—a credit union—in connection with Plaintiff's account applications. Dkt. 110, at 14. Each report identified that Plaintiff had a closed SunTrust account reported on July 12, 2019, with a balance of $458.66 (the "Account"). Dkt. 110-6, at 11-12, 17-18. Each report recommended Chartway *open an account* for Plaintiff. Dkt. 110, at 14; Mem. Op. 2. Chartway provided testimony that nothing in ChexSystems' reports caused it to decline Plaintiff's applications and it *never denied* Plaintiff's applications. Dkt. 110, at 14-15. Rather, Chartway ordered a separate fraud report on Plaintiff from Experian; Chartway then required additional documentation from Plaintiff, which she never provided, and her application expired. *Id.*[1]

[1] Plaintiff claims someone at Chartway told her it denied her based on ChexSystems' report. This is inadmissible hearsay. *See* Mem. Op. 2 (citing Dkt. 156-2, at 3-4).

## B. Class Data Sample

In discovery, ChexSystems produced class data, including a sample of thousands of ChexSystems' reports. Mem. Op. 23; Dkt. 110, at 22-23 (explaining data sample). The sample showed remarkable disparities that are material to class certification. As a few examples, it included (1) consumers with asset and no asset bankruptcies, (2) some whose accounts had been closed for fraud, (3) some who entered into reaffirmation agreements, (4) some whose debts post-dated the bankruptcy filing, and (5) some whose discharge post-dated ChexSystems' report. Dkt. 110, at 9-10, 30. The reported account information in the sample also came from a wide variety of furnishers. *Id.* at 37. Yet, Plaintiff's expert did not find *a single instance* of reporting a discharged debt from many of ChexSystems' largest furnishers in the sample, including not a single instance of SunTrust reporting a discharged debt—the furnisher at issue for Plaintiff. Dkt. 110, at 37.

## C. Procedural Background

In her Amended Complaint, Plaintiff alleged one specific class definition. Dkt. 16, ¶ 63. After discovery closed, Plaintiff moved to certify a radically expanded definition, removing important limitations on the pled class. Mem. Op. 10. Recognizing this dramatic change, Plaintiff sought leave to amend the complaint with the new definition. Dkts. 94, 95. The court denied Plaintiff's motion to amend as dilatory but granted Plaintiff's motion to certify the expanded class definition,

remarkably (and incorrectly) concluding a dramatic increase in the size and terms of the class did not "change the contours of the class." Mem. Op. 10, 13.[2]

The certified class is defined as:

> All natural persons who (1) were the subject of a consumer report furnished by Defendant to a third party within two years before the filing of this action; (2) where the report indicated an outstanding balance or a past due indication on an account existing on the date such person filed a Chapter 7 bankruptcy (whether or not such account was scheduled as a debt) which resulted in the entry of a Discharge Order; and (3) where there is no reaffirmation agreement that makes the account enforceable notwithstanding the discharge and no adversary proceeding in which the account is determined to be non-dischargeable.

Dkt. 293.

## III. QUESTIONS PRESENTED

A. Whether the court manifestly erred in finding predominance and typicality when it failed to analyze the "objectively and readily verifiable" standard for actionable inaccuracy.

B. Whether the court manifestly erred in finding commonality and predominance when it relied on an overly generalized characterization of ChexSystems' policies to grant certification.

---

[2] The court erred. Rule 23 permits *narrowing* a class definition at certification but does not permit *expanding* it—particularly after discovery closes. *See Anderson v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 525, 529 (5th Cir. 2008) ("The district court's authority to certify a class under Rule 23 does not permit it to structure a class around claims not pled."); *Lyons v. PNC Bank, N.A.*, No. CV SAG-20-02234, 2026 WL 364308, at *15 (D. Md. Feb. 10, 2026); *Scroggins v. LexisNexis Risk Sols. FL Inc.*, No. 3:22CV545, 2025 WL 3216323, at *22 (E.D. Va. Mar. 30, 2025).

C. Whether the court manifestly erred in finding Plaintiff and class members had standing despite no evidence that a report recipient read the allegedly inaccurate information or understood its defamatory significance.

D. Whether the court manifestly erred in finding the class ascertainable based on an unperformed expert methodology and despite Plaintiff's expert conceding his methodology did not identify the class the court certified.

## IV. STANDARD OF REVIEW

This Court considers multiple factors "to assess the appropriateness of granting a Rule 23(f) petition," including "whether the district court's certification decision contains a substantial weakness." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 356–57 (4th Cir. 2014) (citing *Lienhart*, 255 F.3d at 145). This Court should grant a Rule 23(f) petition when the class certification decision "is manifestly erroneous and virtually certain to be reversed on appeal." *Lienhart*, 255 F.3d at 145.

## V. REASONS TO GRANT THE PETITION

### A. The court ignored the Fourth Circuit's mandate that an FCRA plaintiff must show "objectively and readily verifiable" inaccuracy, which created manifest error in its predominance and typicality analysis.

Inaccuracy is a threshold element of Plaintiff's claim under 15 U.S.C. § 1681e(b). However, allegedly inaccurate information is *only* actionable under the FCRA when the inaccuracy is "objectively and readily verifiable." *Roberts*, 131 F.4th at 251 (analyzing accuracy under analogous FCRA provision); *accord Ward v. Nat'l Credit Sys., Inc.*, 182 F.4th 918, 933 (10th Cir. 2026) (adopting same

standard); *Holden v. Holiday Inn Club Vacations Inc.*, 98 F.4th 1359, 1369 (11th Cir. 2024) (same).

Not every alleged inaccuracy can support an FCRA claim because CRAs "are not tribunals," and cannot be held to the same standard. *See Roberts*, 131 F.4th at 251 & n.6. "They have neither the resources nor the expertise to conduct the level of investigation that takes place in judicial proceedings or to make the kinds of determinations about disputes that courts make." *Id.* at 251. In certifying the class, the court ignored the *Roberts* decision. Determining whether any inaccuracy is objectively and readily verifiable is a highly individualized issue. The court's disregard of this Court's accuracy standard led to error in its Rule 23 analysis.

1. Whether it was objectively and readily verifiable that each class member's account debt was discharged is a core individualized issue.

Plaintiff must not only prove each class member's debt was discharged before ChexSystems issued each report, she must prove each discharge was objectively and readily verifiable. This is a significant individualized inquiry the court ignored.

Whether an account is discharged requires an individualized legal analysis comparing the records in a bankruptcy case to the underlying debt, which courts consistently find a CRA is not required to undertake. *See Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1109 (8th Cir. 2022) (declining to require a CRA to "wade into individual bankruptcy dockets" because determining discharge requires individual docket analysis and "legal training"); *Hammoud v. Equifax Info. Servs.,*

*LLC*, 52 F.4th 669, 676 (6th Cir. 2022) (finding a CRA is not required to implement procedures to review bankruptcy filings because that would "require[] a person with at least some legal training to manually review the bankruptcy docket"); *Childress v. Experian Info. Sols., Inc.*, 790 F.3d 745, 747 (7th Cir. 2015) (a CRA need not preemptively investigate bankruptcy because it takes "a live human being, with at least a little legal training, to review every bankruptcy dismissal").

The parties' experts agree. For example, *Plaintiff's* bankruptcy expert, Mr. Cox, confirmed that determining if an account is discharged requires a lawyer to review the filings on a bankruptcy docket, and compare them to the underlying debt, using twelve manual steps. Dkt. 110, at 11. In this review, a trained lawyer must be cognizant of complex exceptions to discharge. *Id.* at 29-30.

The court only looked at accuracy across the class in two limited instances. In each instance, it ignored *Roberts*—never mentioning the objectively and readily verifiable standard—and got the analysis thoroughly wrong.

First, the court summarily held a factfinder could determine whether a debt is discharged by looking at the face of a bankruptcy discharge order. According to the court, "***[i]f the debt appears in a publicly available Discharge Order***, then the debt was discharged in bankruptcy, and it would be inaccurate to continue listing such a debt as being owed." Mem. Op. 33-34 (emphasis added).

Bankruptcy discharge orders do ***not*** identify specific debts. The court is simply wrong. *Sykes v. Experian Info. Sols., Inc.*, 183 F.4th 904, 908-09 (7th Cir. 2026) ("discharge status" of a debt "is not an objective fact apparent from the face of the discharge order;" the order "expressly cautions that determining whether an account is covered under the discharge order could require legal analysis"). *See also Taggart v. Lorenzen*, 587 U.S. 554, 564 (2019) ("[B]ecause discharge orders are written in general terms and operate against a complex statutory backdrop, there will often be at least some doubt as to the scope of such orders.").

Second, the court acknowledged that, even in its analysis, the class included members, including Plaintiff, for whom a discharge is not readily apparent from a discharge order. Mem. Op. 31. According to the court, for those individuals, Plaintiff's counsel "can manually review the publicly available bankruptcy records from PACER to determine whether those individuals meet the class definition." *Id.* If determining whether a debt is discharged requires a lawyer to individually review each bankruptcy docket, that is self-evidently not a fact that is objectively and readily verifiable using common proof. *See Mader v. Experian Info. Sols., Inc.*, 56 F.4th 264, 270 (2d Cir. 2023) (holding discharge was "not sufficiently objectively verifiable" when it required "bespoke attention and legal reasoning … to determine the post-bankruptcy validity").

Any liability theory that requires a lawyer to individually review a bankruptcy docket for each individual class member fails Rule 23's predominance requirement.

2. The requirement that an inaccuracy be objectively and readily verifiable also renders Plaintiff atypical.

The failure to properly consider and apply the Fourth Circuit's objectively and readily verifiable standard also introduced manifest error in the court's typicality analysis. Plaintiff cannot satisfy typicality.

Plaintiff's theory for determining classwide inaccuracy is that the court can determine discharge by looking at the filing date of a consumer's bankruptcy, the date of account closure in ChexSystems' records, whether the consumer received a discharge, and if the date of the account closure pre-dated the filing date, the court can presume discharge for everyone. Mem. Op. 31. This methodology, however, would *not* identify Plaintiff as a class member. As a result, the court relied on a special, multi-step customized analysis for Plaintiff, which makes her atypical.

*First*, the date of Plaintiff's debt in ChexSystems' records did *not* pre-date Plaintiff's bankruptcy filing. Plaintiff's Chapter 7 filing was June 17, 2019, and Plaintiff's debt in ChexSystems' records was dated July 12, 2019. Dkt. 110, at 13. Based on these records, Plaintiff's debt would not have been perceived as discharged—even under Plaintiff's reasonable procedures theory.

To remedy this problem, *second*, the court approved of a customized, manual review process to try to assess the accuracy of ChexSystems' reporting for people

like Plaintiff. This special review requires trained lawyers to manually review bankruptcies and compare them to ChexSystems' records to determine if the debt was discharged. Mem. Op. 31-32 ("[A] manual review of public bankruptcy filings can identify which debts were in fact discharged in bankruptcy.").

But, *third*, even this special process would not show Plaintiff's debt as discharged. The SunTrust debt in Plaintiff's bankruptcy schedules does not have an account number that matches ChexSystems' records, and the amount of the SunTrust debt in the bankruptcy schedule differs from the amount of the debt ChexSystems was reporting. Dkt. 110, at 22-23; Dkt. 110-18. Even reviewing Plaintiff's schedules would not identify the Account as discharged.

As a result, *fourth*, to determine discharge, the court looked past the bankruptcy filings and any objective information ChexSystems had on the Account, and relied on Plaintiff's *deposition testimony in this litigation to determine discharge*, which ChexSystems, of course, did not have at the time of its reporting. Mem. Op. 19.

In short, to find Plaintiff typical, the court blessed a separate process to determine discharge *for her* that requires a special review of bankruptcy dockets, assumptions regarding her Account, and a review of her after-the-fact testimony. ChexSystems raised these issues, but the court wrongly dismissed them as "underlying merits" issues, rather than relevant to Rule 23. Mem. Op. 20. This

violates established law. The court must conduct a "rigorous analysis" "*before* a class is certified under Rule 23 – even where that analysis will 'entail some overlap with the merits.'" *Marriott Int'l, Inc. v. Accenture LLP*, 78 F.4th 677, 687 (4th Cir. 2023) (citations omitted).

The variations between Plaintiff's claim and the class strike at the heart of typicality. *See Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006) ("[W]hen the variation in claims strikes at the heart of the respective causes of actions, we have readily denied class certification.") (citations omitted).

**B. The court manifestly erred in finding predominance when it relied on an overly generalized characterization of ChexSystems' policies.**

To avoid these individualized issues (among others), the court framed the case at an impermissibly broad level. This Court recently reminded courts of the "trap" of "relying solely on overly generalized company policies" to certify a class "because these formulations too often disguise the dissimilarity of prospective class members." Dkt. 275, *Overby*, 178 F.4th at 178. The court fell into this trap.

To prove her claim, Plaintiff must show ChexSystems failed to follow reasonable procedures, and it did so willfully. 15 U.S.C. §§ 1681e(b), 1681n; Mem. Op. 15. The court found "all class members share the common question of whether ChexSystems's procedures constitute reasonable measures to assure maximum accuracy of their reports." Mem. Op. 16. In other words, the common question

driving certification was simply whether ChexSystems willfully violated the law. *Id.*

This is exactly the overly broad generalization this Court has repeatedly found inadequate. *Overby*, 178 F.4th at 182 (defining a "broad question of whether" the defendant violated a specific law was insufficient because "commonality and predominance analyses conducted at such high levels of generality … 'may mask a multitude of disparities'") (citation omitted); *Stafford v. Bojangles' Rests., Inc*, 123 F.4th 671, 680 (4th Cir. 2024) (expressing skepticism over "nebulous references to 'systemic failures' or 'systemic deficiencies' to satisfy commonality"). This type of generalization paints over key class differences with an impermissibly broad brush. By defining the reasonable procedures inquiry as whether ChexSystems violated the law, the court stretched too broadly to elicit a common response.

For example, the court refused to consider the reliability of individual furnishers as relevant to the reasonableness of ChexSystems' procedures. Mem. Op. 35. *See supra* Part II.B. Under established law, absent some notice of inaccuracy, a CRA can rely on reliable furnishers without independently verifying the reported information. *Jianqing Wu v. Trans Union*, No. CIVA AW-03-1290, 2006 WL 4729755, at *7 (D. Md. May 2, 2006), *aff'd sub nom. Jianqing Wu v. Equifax*, 219 F. App'x 320 (4th Cir. 2007) (citation omitted). *See also Wright v. Experian Info. Solutions, Inc.*, 805 F.3d 1232, 1239-40 (10th Cir. 2015). The reliability of a

furnisher is often a significant factor in assessing liability. *See, e.g.*, *Butler v. Trans Union, LLC*, No. 24 C 211, 2025 WL 2767016, at *5 (N.D. Ill. Sept. 29, 2025) (granting summary judgment to CRA because there was no evidence the furnisher was unreliable).

With that in mind, if a furnisher has a *perfect* accuracy record, is it unreasonable for ChexSystems to rely on that furnisher? What about a furnisher with a 99% accuracy record? What about furnishers (like SunTrust) with an extensive history of updating prior reporting based on consumer bankruptcies—would it be unreasonable for ChexSystems to rely on those furnishers? What about a furnisher that ChexSystems specifically audited, and reviewed and approved its accuracy procedures? The court refused to consider any such questions, despite their critical importance to class certification.

These questions are particularly impactful here given that ChexSystems produced vast records regarding reliability as to individual furnishers, including data showing many furnishers did not have a single example of a supposed inaccuracy in the thousands of reports ChexSystems produced. Dkt. 110, at 17. Recognizing these facts, the court rightly acknowledged that "some inquiry into individualized furnishers may be necessary," but it quickly (and improperly) disregarded the issue as immaterial because of its generalized framing of the common question—"whether ChexSystems' policies are reasonable …." Mem. Op. 35.

Like in *Overby*, "[i]n defining the common question at too high a level, the district court failed to observe the myriad variations in … circumstances." 178 F.4th at 178. This is manifest error. "Allegations of generalized policies are not usually sufficient for the purposes of class certification." *Stafford*, 123 F.4th at 680.

### C. The court manifestly erred in finding Plaintiff and class members had standing despite no evidence that any consumer report recipient read a report and understood its defamatory significance.

The court also erred in its standing analysis and its impact on Rule 23. The court correctly observed that reputational standing requires, at a minimum, that "a third party has read the misleading information *and understood its defamatory significance*." Mem. Op. 21 (citing *Fernandez*, 116 F.4th at 297) (emphasis added). However, after citing this standard, the court brushed past it for Plaintiff and the class.

First, the court erroneously held "Riddick has adequately shown that she has standing because Chartway requested, received, and reviewed her inaccurate QualiFile report …." Mem. Op. 21. That is not the *Fernandez* standard. The court did *not* find Chartway reviewed the allegedly inaccurate information or understood its defamatory significance. *Id.* Nor could it. There is no admissible evidence demonstrating Chartway reviewed ChexSystems' report *on the Account* or understood its *defamatory significance*. Rather, the report recommended Chartway "accept" Plaintiff's application based on Chartway's criteria, indicating Chartway

did not find anything in the report defamatory. The court cannot assume the elements of standing when there is no such record evidence.

Second, the court wrongly found each class member had standing "if they were the subject of a credit report containing incorrect information about them that was provided to and reviewed by a third-party." Mem. Op. 34. The court held that "so long as the class members fit the class definition, they would have a claim …." *Id.* Critically, there is no requirement in the class definition that the allegedly inaccurate information was "reviewed by a third party," Mem. Op. 4 (class definition), so the court's conclusion is disconnected from the class. Additionally, in *Fernandez*, this Court squarely rejected the idea that class members had standing based solely on "dissemination." 116 F.4th at 301. Instead, a third party must have "*read* the misleading information *and understood* its defamatory significance." *Id.* at 297 (emphasis added). Yet, in certifying the class, the court did not (nor could it) include *any* requirement that the report recipients read or understood the allegedly inaccurate information in each class member's report.

The court wrongly brushed past the constitutional requirement that class members have Article III standing, as the Fourth Circuit has articulated it. The court's holding was manifest error.

**D. The court manifestly erred in finding the class ascertainable based on an unperformed expert methodology and despite Jaffe conceding his methodology did not find the defined class.**

In its decision, the court relied heavily on the erroneous conclusion that Plaintiff's expert, Jaffe, provided a reliable methodology to ascertain class members, despite his methodology being incomplete and ever shifting. The court erred in three ways.[3] First, by presuming Jaffe's methodology found members of the modified class definition, which Jaffe freely admitted it did not. Second, by crediting analytical steps Jaffe never performed, in violation of *Sardis v. Overhead Door Corporation*, 10 F.4th 268 (4th Cir. 2021). Third, by finding Jaffe's methodology reliable despite a known error rate of at least 42%. And even this 42% does not fully capture the errors in Jaffe's analysis because he never performed his potential methodology on the remaining 58%.

1. <u>The court certified a class that Jaffe's methodology was not designed to identify.</u>

A precondition of admissibility is "fit" – expert opinions must assist "the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993). Jaffe's opinions did not fit the certified class. Jaffe analyzed "Bankruptcy Criteria" predicated on the class

[3] Because the court's ruling on certification and on the Motion to Strike are inextricably intertwined, *see* Mem. Op. 30 n.12, the Court may review *Daubert* findings in a 23(f) appeal. *See Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 95 F.4th 181, 188 (4th Cir. 2024).

definition in the Amended Complaint – not the different certified class definition. Jaffe consistently admitted his criteria were not designed to find the new class.[4] The court conceded that Jaffe's "search parameters do not perfectly align with the class definition," Mem. Op. 27, yet it certified anyway, treating the criteria as "a close approximation." *Id.* at 28.

A "close approximation" is not a rigorous analysis. Certification demands Plaintiff satisfy the requirements of Rule 23, requiring actual, not presumed, compliance. *EQT Prod. Co.*, 764 F.3d at 361. An expert's method that is not designed to capture the certified class cannot "readily identify the class members in reference to objective criteria." *Id.* at 358 (citations omitted). By accepting a methodology aimed at a different population, the court lowered Plaintiff's burden and materially misapplied Rule 23.

2. <u>The court violated *Sardis* by crediting analytical steps Jaffe never performed.</u>

To bridge the gap between Jaffe's criteria and the class definition, the court relied not on what Jaffe *did*, but what he claimed he *could* do. The court waved away ChexSystems' objection that Jaffe's "Bankruptcy Criteria" did not find putative class members, crediting Jaffe's assertion in his rebuttal report that "an additional parameter can be added to his automated method through a documented

[4] Dkt. 201-4, at 7-8 (Jaffe Dep. 117:14-118:5).

Chrome-based extension," and Jaffe's statement that "he is able to modify his process to identify" reaffirmation agreements or adversary proceedings. Mem. Op. 27. Thus, the court's ascertainability holding rests on the premise that "Jaffe's method can add an additional automated step." *Id.* at 31. Yet ***at no point*** did Jaffe perform the steps the court relied on.

Crediting an unperformed methodology is the precise error this Court condemned in *Sardis*. Rule 702's "gatekeeping function requires more than simply taking the expert's word for it." *Sardis*, 10 F.4th at 290 (citations and quotation marks omitted). Where an expert "conducted no testing whatsoever," of a particular facet of his methodology, his theory "is no more than a hypothesis, and it thus is not knowledge, nor is it based upon sufficient facts or data or the product of reliable principles and methods." *Id.* A court may not let a reliability challenge pass to the factfinder as a matter of "weight" – doing so delegates the indispensable gatekeeping function required by Rule 702. *Id.* at 284.

Jaffe's representations that parameters *can* be added and that he "is able to modify his process" are textbook hypotheses offered without validation. Mem. Op. 27. The court had no way to assess whether the proposed extensions would, in fact, capture the class (however defined) accurately, "recreate and test" them "for the potential rate of error," or confirm they would operate at scale. *Sardis*, 10 F.4th at 291. Accepting them on Jaffe's say-so was an abdication of the gatekeeping role.

And the court erroneously found Jaffe's methodology reliable even though at least 42% of those he identified as class members are admittedly not actually class members. Mem. Op. 28-29. Not only does this high error rate "weigh[] heavily against the admissibility" of Jaffe's opinion, *see Davis v. Capital One, N.A.*, No. 24-1507, 2025 WL 2445880, at *5 (4th Cir. Aug. 26, 2025), it is also artificially low. Jaffe did not perform the rest of his hypothetical methodology on the remaining persons he identified as putative class members. His failure to do so meant the court did not analyze the true reliability of the method.

3. Without a reliable identification method, the class is not ascertainable.

Ascertainability is an "implicit threshold requirement" of Rule 23: "[a] class cannot be certified unless a court can readily identify the class members in reference to objective criteria," and "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *EQT Prod. Co.*, 764 F.3d at 358 (citations omitted). This Court vacated certification in *EQT* where identifying class members required an individualized, record-by-record process, and rejected the argument that identification could be deferred to the "back-end." *Id.* at 359.

Here, the court's own findings establish that Jaffe's methodology included a flawed process, and even those individuals he could identify still required, at a minimum, further "individualized review," potentially by counsel, and "a manual

review of public bankruptcy filings ….” Mem. Op. 32. This is the precise individualized fact-finding *EQT* forbids.

Having failed to conduct the "rigorous analysis" Rule 23 requires, the court materially misapplied the ascertainability standard.

## VI. CONCLUSION

This Court should grant this Rule 23(f) Petition because the court's opinion is manifestly erroneous.

Dated: October 14, 2026 Respectfully submitted,

**CHEX SYSTEMS, INC.**

By: */s/ David M. Gettings*
David M. Gettings (VSB # 80394)
John C. Lynch (VSB # 39267)
Kathleen M. Hutchenreuther (VSB # 90845)
TROUTMAN PEPPER LOCKE LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510
Email: dave.gettings@troutman.com
Email: john.lynch@troutman.com
Email: kathleen.hutchenreuther@troutman.com

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 5(c)(1), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,190 words.

Dated: October 14, 2026

Respectfully submitted,

**CHEX SYSTEMS, INC.**

By: */s/ David M. Gettings*
David M. Gettings (VSB # 80394)
John C. Lynch (VSB # 39267)
Kathleen M. Hutchenreuther (VSB # 90845)
TROUTMAN PEPPER LOCKE LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510
Email: dave.gettings@troutman.com
Email: john.lynch@troutman.com
Email: kathleen.hutchenreuther@troutman.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2026, I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, and I further certify that a true and correct copy of the foregoing Petition for Leave to Appeal Class Certification Order Pursuant to Federal Rule of Civil Procedure 23(f) was sent via electronic mail and first class mail to the following counsel of record:

**Counsel for Plaintiff-Respondent**

Leonard A. Bennett, VSB #37523
Craig C. Marchiando, VSB #89736
Mark C. Leffler, VSB #40712
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com
Email: mark@clalegal.com

Drew D. Sarrett, VSB #81658
Emily Connor Kennedy, VSB #83889
Consumer Litigation Associates, P.C.
626 E. Broad Street, Suite 300
Richmond, VA 23219
Telephone: (804) 905-9900
Facsimile: (757) 930-3662
Email: drew@clalegal.com
Email: emily@clalegal.com

*Counsel for Plaintiff-Respondent*

By: */s/ David M. Gettings*
David M. Gettings (VSB # 80394)

**Case No. ___**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

CHEX SYSTEMS, INC.,

Defendant-Petitioner,

v.

SHARON K. RIDDICK,
on behalf of herself and all others similarly situated,

Plaintiff-Respondent,

---

On Appeal from the United States District Court for the
Eastern District of Virginia, Norfolk Division, No. 2:24-cv-700

---

**DEFENDANT'S PETITION FOR LEAVE TO APPEAL CLASS CERTIFICATION ORDER PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)**

---

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SHARON K. RIDDICK,
*on behalf of herself and all others similarly situated*,

Plaintiff,

v. Civil Action No. 2:24-cv-700

CHEX SYSTEMS, INC.,

Defendant.

**MEMORANDUM OPINION**

This matter is before the Court on Plaintiff Sharon Riddick's Motion for Leave to Amend Complaint, Dkt. No. 94, and Motion to Certify Class, Dkt. No. 96, filed on behalf of herself and others similarly situated. Defendant Chex Systems, Inc. ("ChexSystems") responded to both motions, Dkt. Nos. 105, 110, and Riddick replied, Dkt. Nos. 107, 156. The parties have also filed motions to exclude the opinions of experts whose reports have been relied upon by the parties in various motions. Dkt. Nos. 196, 198, 200, 207, 213. The Court dispenses with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J).

For the reasons stated below, Riddick's Motion to Amend is DENIED, Dkt. No. 94; ChexSystems's Motion to Exclude the Expert Report and Testimony of Jonathan Jaffe is DENIED IN PART, Dkt. No. 200; and Riddick's Motion to Certify Class is GRANTED IN PART AND DENIED IN PART, Dkt. No. 96.

## I. BACKGROUND

ChexSystems is a consumer reporting agency ("CRA") that specializes in providing consumer reports to financial institutions to assist the institutions in opening new accounts for

individual consumers. Dkt. No. 16 ¶ 2. One type of report that ChexSystems sells is called a QualiFile report. A QualiFile report shows details about a consumer's financial history, and it is requested by financial institution clients who are determining whether to open a new bank account for the consumer. Dkt. No. 114-1 ¶¶ 5–6. The report provides a recommendation to the client regarding whether to open the consumer's requested account. *Id.* Among the information included in the QualiFile report is whether the consumer had a prior account closed by any other financial institutions. *Id*. To create these reports, ChexSystems contracts with other financial institutions to receive information about the consumer. *Id.* ¶¶ 5, 8.

In January 2024, Riddick applied to open a checking account with Chartway Federal Credit Union ("Chartway"). As part of the application process, Chartway ordered a QualiFile report about Riddick from ChexSystems. Dkt. No. 110-6 ¶ 6–7. The QualiFile report showed that SunTrust Bank ("SunTrust") had forcibly closed one of Riddick's SunTrust accounts. Dkt. No. 110-6, Ex. B. The report indicated that the account closure was reported on July 12, 2019, and that Riddick still owed SunTrust several hundred dollars. *Id.* Although the report recommended that Chartway open an account for Riddick, Chartway declined to do so. Dkt. No. 110-6, Ex. B; Dkt. No. 156-2, at 3–4. Riddick tried to open a Chartway checking account again in March 2024, but she was again declined. Dkt. No. 156-2, at 3–4. During her second attempt, Chartway received a similar QualiFile report again stating that SunTrust had forcibly closed Riddick's account and that Riddick owed SunTrust several hundred dollars. Dkt. No. 110-6, Ex. D.

Riddick alleges that the QualiFile reports are inaccurate because her debt to SunTrust was extinguished in September 2019, the date a bankruptcy court entered an order discharging the debt (the "Discharge Order"). Dkt. No. 156-2, at 3. Riddick originally filed for Chapter 13 bankruptcy in July 2017 and converted it to a Chapter 7 bankruptcy proceeding in June 2019. Dkt. No. 110-

17. When she converted her bankruptcy, Riddick listed her SunTrust account on the schedule of unpaid debts filed with the bankruptcy court.[1] Dkt. No. 110-16.

Riddick contends that Chartway refused to open her checking account because the QualiFile reports inaccurately showed that Riddick had an unpaid, charged-off account with SunTrust. Dkt. No. 156-2, at 3–4. Riddick filed suit, for herself and on behalf of others, alleging that ChexSystems failed to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual[s]" in its reporting as required by the Fair Credit Reporting Act ("FCRA"). 15 U.S.C. § 1681e(b); *see* Dkt. No. 16 ¶ 21. Riddick contends that ChexSystems lacks adequate procedures for determining whether a debt was discharged in bankruptcy. ChexSystems essentially relies on the financial institutions that it contracts with to identify which debts have been discharged and does not look at publicly available court information or other sources to check for debt discharges. *See* Dkt. No. 97-1, at 4. Riddick reasons that if ChexSystems had a policy or practice of reviewing publicly available bankruptcy court records, then ChexSystems likely would not have inaccurately reported that Riddick still owed a debt to SunTrust for her previously discharged account. Dkt. No. 97, at 6–8.

Riddick also contends that ChexSystems's practice of failing to conduct further review of the bankruptcy status of a consumer is something that affects a wide range of individuals who have erroneously been denied accounts or other financial opportunities because of inaccurate credit reporting. In Riddick's First Amended Complaint, she proposed the following class definitions:

> All natural persons who (1) were the subject of a consumer report furnished by Defendant to a third party within five years before the filing of this action; (2) where the report indicated an outstanding balance or a past due indication on an account scheduled as a debt

---

[1] Riddick's QualiFile reports indicate an outstanding balance on the SunTrust account that is approximately $30 higher than reported on Riddick's bankruptcy schedule of debts. Dkt. No. 110-16.

> in a Chapter 7 or Chapter 13 bankruptcy which resulted in the entry of a Discharge Order.

Dkt. No. 16 ¶ 63.[2]

Riddick filed her Motion to Certify Class, Dkt. No. 96, and a Motion for Leave to Amend Complaint, Dkt. No. 94, on the same day. Riddick acknowledges that discovery has ended and that the time for filing amended pleadings has passed but contends that she should be permitted to amend the class definitions to read as follows:

> All natural persons who (1) were the subject of a consumer report furnished by Defendant to a third party within two years before the filing of this action; (2) where the report indicated an outstanding balance or a past due indication on an account existing on the date such person filed a Chapter 7 bankruptcy (whether or not such account was scheduled as a debt) which resulted in the entry of a Discharge Order; and (3) where there is no reaffirmation agreement that makes the account enforceable notwithstanding the discharge and no adversary proceeding in which the account is determined to be non-dischargeable.

Dkt. No. 95, at 4–5; Dkt. No. 97, at 8.

Both parties relied on their respective expert witness reports in their briefs regarding the Motion to Certify Class. *See* Dkt. Nos. 97-5, 97-6, 101-1, 114-6, 114-8, 160-1. Likewise, both parties have moved to exclude each other's experts that were used for the respective briefs. *See* Dkt. Nos. 196, 198, 200, 207, 213.

---

[2] Riddick also proposes a Virginia Subclass—both in her First Amended Complaint and proposed Second Amended Complaint—which is the same in all respects to the nationwide class except limited to individuals "with a primary address located in Virginia, within Defendant's file." Dkt. No. 16 ¶ 64; Dkt. No. 95, at 5; Dkt. No. 97, at 8. Other than identifying the Virginia Subclass, the parties do not address why a subclass is needed, how it differs in substance from the nationwide class, or how it satisfies Rule 23. *See* Fed. R. Civ. P. 23(c)(5) (subclasses treated as a class under Rule 23). Because "district courts may certify subclasses *sua sponte*," *Stafford v. Bojangles' Rests., Inc.*, 123 F.4th 671, 682 (4th Cir. 2024) (citation modified), and given the deficiencies identified above, the Court will not certify the Virginia Subclass at this time. To the extent that Riddick seeks to certify the Virginia Subclass, that motion is DENIED.

## II. LEGAL STANDARD

### A. Amending Pleadings After Deadline Has Passed

Generally, a court should liberally grant a party leave to amend their pleadings. Leave to amend "should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Moore v. Equitrans, L.P.*, 27 F.4th 211, 218 (4th Cir. 2022) (citation modified); *see* Fed. R. Civ. P. 15(a)(2). Once a court's scheduling order sets a deadline for amending pleadings, however, a motion to amend will only be granted upon a showing of good cause. *See* Fed. R. Civ. P. 16(b)(4); *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008). "Rule 16(b)'s good cause standard focuses on the timeliness of the amendment and the reasons for its tardy submission; the primary consideration is the diligence of the moving party." *Montgomery v. Anne Arundel Cnty.*, 182 F. App'x 156, 162 (4th Cir. 2006).

If a litigant demonstrates good cause to amend their pleading after the deadline has passed, the court must then determine whether the amendment is permitted by Rule 15(a)(2). *See Cook v. Howard*, 484 F. App'x 805, 814–15 (4th Cir. 2012) ("[U]nder Rule 16(b)(4), a party must first demonstrate 'good cause' to modify the scheduling order deadlines, before also satisfying the Rule 15(a)(2) standard for amendment."). Consistent with Rule 15(a)(2)'s more liberal standard, "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (citations omitted).

### B. Excluding Expert Witnesses

Courts in this circuit have reasoned that "[w]hen an expert's report or testimony is critical to class certification, the district court must make a conclusive ruling on any challenge to that

expert's qualifications or submissions before it may rule on a motion for class certification." *Robinson v. Nationstar Mortg. LLC*, No. 14-3667, 2019 WL 4261696, at *13 (D. Md. Sept. 9, 2019) (citation modified). "An expert's testimony is 'critical' where it is important to an issue decisive for the motion for class certification." *Id.* (citation modified).

The Federal Rules of Civil Procedure require a party who intends to offer expert testimony at trial to provide the opposing party with an expert report. In addition to the disclosure requirement, an expert's testimony must rest on a reliable foundation and be relevant to the task at hand. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021). Courts analyze the admissibility of expert testimony under Rule 702 of the Federal Rules of Evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

However, "questions regarding the factual underpinnings of the expert witness' opinion affect the weight and credibility of the witness' assessment, not its admissibility." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (citation modified). Additionally, relevant evidence—meaning evidence that is admissible under Federal Rule of Evidence 402—may nevertheless be excluded if its probative value is substantially outweighed by the dangers of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403. The proponent of the expert testimony must establish its

admissibility by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

**C. Standard for Certifying a Class**

To certify a class action, the Court must find that the proposed class satisfies the requirements of Federal Rule of Civil Procedure 23. Under Rule 23(a), the proposed class must meet the following four criteria: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the representative's claims or defenses are typical of those of the class; and (4) the representative will fairly and adequately represent the interests of the class." *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 195 (E.D. Va. 2015). The commonality, typicality, and adequacy requirements "tend to merge, with commonality and typicality serving as guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998) (citation modified). In addition to the four explicit requirements of Rule 23(a), class certification requires that the proposed class be ascertainable, or "readily identifiable." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (citations omitted).

The class must also satisfy the requirements of one of three categories provided in Rule 23(b). Here, Riddick proceeds under Rule 23(b)(3), which means that certification is only proper if the Court finds that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These are known as the "predominance" and "superiority" requirements.

The party seeking class certification—in this case, Riddick—bears the burden of proving that Rule 23's requirements are satisfied by a preponderance of the evidence. *In re NII Holdings, Inc. Secs. Litig.*, 311 F.R.D. 401, 405 (E.D. Va. 2015). On a motion for class certification, "a court should engage the merits of a claim only to the extent necessary to verify that Rule 23 has been satisfied." *Brown v. Nucor Corp.*, 785 F.3d 895, 903 (4th Cir. 2015) (citation omitted). Rule 23, however, "holds plaintiffs to a higher bar than a pleading standard." *Stafford*, 123 F.4th at 679 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Plaintiffs moving for class certification "must affirmatively demonstrate [their] compliance with the Rule." *Dukes*, 564 U.S. at 350. The Court must then "take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (citation omitted). This means that the class certification analysis will often "entail some overlap with the merits of the plaintiff[s'] underlying claim[s]." *Dukes*, 564 U.S. at 351.

## III. ANALYSIS

### A. Motion to Amend

Riddick moved to amend her complaint primarily to change the purported class definitions set forth in her First Amended Complaint. Dkt. No. 95, at 4–5. According to Riddick, "the proposed Second Amended Complaint makes only minor factual clarifications that conform the complaint to the evidence in the case." *Id.* at 9. In support of her Motion to Amend, Riddick argues that she meets "the 'good cause' standard" because she "has acted diligently throughout this case." *Id*.

Riddick filed her motion for leave to amend nearly eight months after the deadline set by the Court's scheduling order. Dkt. Nos. 27, 87, 94. While Riddick maintains that she has diligently met all required deadlines in the case, she provides no reason for the late filing, nor does she allege

that the information (or other clarifications of fact) underlying her proposed changes was unavailable to her before the deadline passed. Accordingly, Riddick has not demonstrated good cause to amend, and the Court denies her Motion for Leave to Amend Complaint. Dkt. No. 94. *See Montgomery*, 182 F. App'x at 162.

**B. Request to Modify Class Definition**

While the Court denies Riddick's Motion for Leave to Amend Complaint, the Court will still address the Motion to Certify Class and review the proposed class definition contained in that motion. Dkt. Nos. 96, 97. A plaintiff in a class action usually does not need to file a motion for leave to amend their complaint when the only change is a modification to the proposed class. Many courts "have recognized the flexibility involved in crafting a class definition and have permitted deviation from the complaint at the class certification stage." *McMillan v. Kan. City Life Ins. Co.*, 762 F. Supp. 3d 443, 455 (D. Md. 2025) (citation omitted); *see also Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 431 (4th Cir. 2003) (permitting a certified class definition to differ from one pled in the complaint). Indeed, this Court has previously held that "it is inappropriate to constrain the parties to the class definition propounded in the plaintiff's pleadings, particularly in light of the 'ongoing refinement and give-and-take inherent in class action litigation, particularly in the formation of a workable class definition.'" *Henderson v. Corelogic Nat'l Background Data, LLC*, No. 3:12-cv-97, 2016 WL 4611571, at *4 (E.D. Va. Sept. 2, 2016) (quoting *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004)). Changes to a class definition should not result in rejection of a purported class so long as the proposed changes do not "substantially change the contours of the class or unduly prejudice [d]efendants." *Lyons v. PNC Bank, N.A.*, No. 20-2234, 2026 WL 364308, at *14 (D. Md. Feb. 10, 2026) (citation omitted). If a plaintiff attempts to "offer an entirely new claim or theory of the case," however, amendment is necessary. *Henderson*, 2016

WL 4611571, at *4; *Scroggins v. LexisNexis Risk Sols. FL Inc.*, No. 3:22-cv-545, 2025 WL 3216323, at *18, 22 (E.D. Va. Mar. 30, 2025) (construing motion to certify class as a motion to amend given "substantial changes" to the class definition).[3]

The Court concludes that the proposed changes to the class definition do not substantially change the contours of the class, nor is ChexSystems prejudiced by the proposed changes. *Compare* Dkt. No. 97, at 8, *with* Dkt. No. 16 ¶¶ 63, 64. The newly proposed class definition is as follows, with edits shown (bold for new additions, strikethrough for removed language):

> All natural persons who (1) were the subject of a consumer report furnished by Defendant to a third party within **two** ~~five~~ years before the filing of this action; (2) where the report indicated an outstanding balance or a past due indication on an account **existing on the date such person filed** ~~scheduled as a debt in~~ a Chapter 7 **bankruptcy (whether or not such account was scheduled as a debt)** ~~or Chapter 13 bankruptcy~~ which resulted in the entry of a Discharge Order; **and (3) where there is no reaffirmation agreement that makes the account enforceable notwithstanding the discharge and no adversary proceeding in which the account is determined to be non-dischargeable.**

Certainly, some of the changes narrow the class. For example, the newly proposed class reduces the class period from five to two years, omits individuals who filed Chapter 13 bankruptcies (including only individuals who filed Chapter 7 bankruptcy), and adds a condition that excludes certain consumers (those with reaffirmation agreements or whose account is determined to be non-dischargeable). ChexSystems does not focus on these changes, and the Court concludes that these changes reflect mere refinement of the class.

---

[3] As *Scroggins* demonstrates, plaintiffs must tread carefully in determining whether changes to a class definition should be made through amendment or as part of their motion for class certification. The complexity of the decision is compounded by the timing of a typical class case, in which a motion for class certification is filed after discovery closes.

Riddick's proposed change to the class definition with respect to the identification of the accounts at issue, however, warrants further discussion. Previously, the class definition included only accounts "scheduled as a debt" in Chapter 7 (or the now-deleted Chapter 13) bankruptcy, whereas the revised class definition includes accounts "existing on the date such person filed a Chapter 7 bankruptcy (whether or not such account was scheduled as a debt)." *See* Dkt. No. 16 ¶ 63. The change in how the relevant accounts are identified was necessitated by Plaintiff's decision to exclude Chapter 13 bankruptcies. As Plaintiff notes, the Bankruptcy Code has different rules for consumer debts depending on the type of bankruptcy. Dkt. No. 95, at 5–6.[4] Given these differences, identification of the accounts by whether the account was scheduled as a debt was logical. But if only Chapter 7 bankruptcies are included in the class, that decision makes less sense. In a Chapter 7 bankruptcy, the Bankruptcy Code allows both scheduled and nonscheduled debts to be discharged.[5] *In re Alexander*, 300 B.R. 650, 655 (Bankr. E.D. Va. 2003) ("[The Bankruptcy Code] is unambiguous in that it discharges every prepetition debt, without regard to whether a proof of claim has been filed and does not distinguish between scheduled and nonscheduled debts."

---

4 Debts incurred post-petition, i.e. after the Chapter 7 case is initiated, are generally not dischargeable, 11 U.S.C. § 523, 727(b), whereas under Chapter 13, certain post-petition consumer debt may be discharged, 11 U.S.C. § 1305.

5 Most Chapter 7 bankruptcies are "no-asset" cases where the debtor does not have any assets that could be liquidated and the process is therefore streamlined. *See In re Rollison*, 579 B.R. 67, 72 (Bankr. W.D. Va. 2018); Dalié Jiménez, *The Distribution of Assets in Consumer Chapter 7 Bankruptcy Cases*, 83 Am. Bankr. L.J. 795, 797 (2009) ("93% of Chapter 7 individual debtors did not have any unencumbered non-exempt assets that could be distributed to unsecured creditors."). Subject to certain exceptions, or if ordered otherwise, all of a debtor's prepetition debts, both scheduled and unscheduled, are discharged in a no-asset Chapter 7 proceeding. This differs from cases in which the debtor does have assets; in those instances the debtor generally must schedule a debt to have it discharged. *See In re Madaj*, 149 F.3d 467, 469 (6th Cir. 1998) ("Thus, [11 U.S.C.] § 523(a)(3)(A) excepts a debt from discharge if the debt was not scheduled in time for a timely filing of the proof of claim.").

(citation modified)). For this reason, contends Riddick, the amended class definition better reflects what typically occurs in consumer bankruptcy and will improve the administration of the class.

Notwithstanding these points, the inclusion of nonscheduled debts could result in more accounts (and thus more class members) being included in the class. Moreover, the proposed change is not insignificant, as the identification of the accounts at issue is a key component of determining both the class and the claims. But even so, the Court concludes that amendment is appropriate here for two reasons. First, the revised class definition does not substantially change the contour of the class, nor does it represent a new claim or theory. Second, the change does not prejudice ChexSystems because discovery in this case focused generally on ChexSystems's procedures for identifying debts that were discharged in bankruptcy, regardless of whether such debts were scheduled.

The contours of the proposed class remain the same because the class definitions always included individuals who had a debt discharged in a Chapter 7 bankruptcy and were subject to an allegedly inaccurate ChexSystems report. Importantly, ChexSystems's bankruptcy policies do not appear to distinguish between scheduled and unscheduled debts when its furnishing institutions indicate that a particular debt was discharged in bankruptcy. *See* Dkt. No. 114-1 ¶¶ 16–17, Ex. D, Ex. F. As a result, the primary issues in this case—identification of the accounts at issue and ChexSystems's policies—are not substantially impacted by the change in class definition.

ChexSystems is also not prejudiced by the newly proposed class definition because discovery adequately explored key issues under the new definition. ChexSystems contends the parties did not focus their discovery on debts that were discharged but not scheduled as debts in a bankruptcy. Dkt. No. 105, at 13; Dkt. No. 110, at 43. This argument misses the point: the parties did not differentiate between scheduled and unscheduled debts at any point during discovery. For

example, Riddick asked ChexSystems to identify the number of consumers who were the subject of a published consumer report "where the report indicated an outstanding balance or a past due indication on an account on the report that was open when the bankruptcy was filed or open after the bankruptcy was filed and before the bankruptcy was converted from a Chapter 13 to a Chapter 7." Dkt. No. 110-10, at 4. Notably missing from this request is a requirement that the account be scheduled in the bankruptcy filings. As noted above, ChexSystems's policies do not appear to distinguish between scheduled and unscheduled debts and ChexSystems does not identify any policies that were relevant to the revised definition but not included in discovery. *See* Dkt. No. 114-1 ¶¶ 16–17, Ex. D, Ex. F. And finally, the experts in the case considered both versions of the proposed class definitions in their expert reports. *See, e.g.,* Dkt. No. 114-7 ¶ 9 (Kalat report).

Consequently, for purposes of class certification, ChexSystems is not prejudiced by the variance between the class definition proposed in the Motion to Certify Class and that included in the First Amended Complaint. Therefore, while the Court will deny the Motion to Amend the Complaint, Dkt. No. 94, the Court will still review the newly proposed class definitions as they are pled in the Motion to Certify Class.

**C. Rule 23(a)**

1. Numerosity

Rule 23(a) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While there is no minimum number of class members required to meet this threshold, *see Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967), "joinder usually becomes impracticable where the class exceeds 40 members." *Clark v. Trans Union, LLC*, No. 3:15-cv-391, 2017 WL 814252, at *7 (E.D. Va. Mar. 1, 2017) (citation omitted); *accord Khosbaba v. Stilwell*, No. 2:24-cv-237, 2025 WL 3298314, at

*8 (E.D. Va. Nov. 26, 2025). Here, Riddick relies on a report prepared by one of her expert witnesses, Jonathan Jaffe, to assert that there are thousands of members in the proposed nationwide class. *See* Dkt. No. 97, at 11; Dkt. No. 101-1 ¶¶ 27–33. While ChexSystems moves to exclude Jaffe's report and testimony under *Daubert* and Rule 702,[6] ChexSystems does not specifically argue that the purported class is of such a size that joinder of all plaintiffs would be practicable. Dkt. No. 200; Dkt. No. 110, at 10. Moreover, the dataset relied upon by Jaffe to identify individuals who meet his "Bankruptcy Criteria" is sufficient to show that Riddick satisfies the numerosity requirement. Dkt. No. 101-1 ¶¶ 27, 31. Accordingly, the Court finds that Riddick satisfies Rule 23(a)'s numerosity requirement.

2. Commonality

Rule 23(a)(2) requires the plaintiff to show that there are questions of law or fact that are common to the class. To satisfy Rule 23(a)'s commonality requirement, class members' claims must be based on a "common contention" that is "of such a nature that it is capable of classwide resolution." *Dukes*, 564 U.S. at 350. While class members must have "suffered the same injury," it is not enough to demonstrate that they have "all suffered a violation of the same provision of law." *Id.* (citation omitted). Instead, the "common contention" must be such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* In short, "commonality requires that the class present dispositive questions which will propel the case through the system." *Soutter*, 307 F.R.D. at 200.

When a plaintiff brings a class claim under Rule 23(b)(3), as Riddick does here, "the commonality requirement of Rule 23(a)(2) is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over other questions."

[6] The Court addresses this motion below in relation to ascertainability.

*Gray v. Hearts Comms., Inc.*, 444 F. App'x 698, 700 (4th Cir. 2011) (citations omitted). "Rule 23(b)(3)'s predominance requirement is 'far more demanding' than Rule 23(a)'s commonality requirement and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)). "Nonetheless, the Rule 23(a) commonality requirement, and the Rule 23(b)(3) predominance requirement remain separate inquiries and the inquiries should not be 'blended.'" *Ealy v. Pinkerton Gov't Servs.*, 514 F. App'x 299, 305 (4th Cir. 2013) (quoting *Dukes*, 564 U.S. at 359).

Here, Riddick's claim regarding the inaccurate information stated in her credit report arises under the FCRA, which requires a CRA like ChexSystems to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). To prevail on her FCRA claim, Riddick must prove that "(1) the consumer report contains inaccurate information and (2) the reporting agency did not follow reasonable procedures to assure maximum possible accuracy." *Soutter*, 307 F.R.D. at 193 (citation omitted). Riddick also alleges that ChexSystems's actions were willful, which requires her to prove that ChexSystems "knowingly and intentionally committed an act in conscious disregard for the rights of the consumer." *Id.* (citation omitted).

Riddick argues that the "core factual issue is the existence and adequacy of ChexSystems's procedures (or lack thereof) for reporting discharged debts" and that the "core legal issue [is] whether ChexSystems's conduct violates FCRA § 1681e(b)'s 'reasonable procedures' mandate." Dkt. No. 97, at 15 (citations modified). Riddick contends that "every class member's claim raises the same common contention: that Chex[Systems'] standard reporting procedure (relying solely on furnishers and failing to verify bankruptcy discharges) was unreasonable under § 1681e(b)"

and that "all class members were injured by the same pattern of inaccurate reporting." *Id.* at 16 (citation modified). The Court addresses each point in turn.

First, all class members share the common question of whether ChexSystems's procedures constitute reasonable measures to assure maximum accuracy of their reports. *See* § 1681e(b). ChexSystems employs a common procedure for determining when discharged debts are included in its reports. *See, e.g.*, Dkt. Nos. 114-1 ¶¶ 13–17. As ChexSystems's president, Ronald Whyte, testified, ChexSystems relies primarily on the financial institutions that furnish the relevant account data and the individual consumers themselves to maintain an accurate report about an individual. Dkt. No. 97-1, at 10–11. ChexSystems has procedures in place to vet its furnishing institutions and requires institutions to provide an update on whether a debt has been discharged in bankruptcy. *See* Dkt. Nos. 114-1 ¶¶ 13–17. But ChexSystems does not independently review (or "scrub") publicly available court data concerning individuals' bankruptcy filings or discharges. *See* Dkt. No. 97-1, at 14–15. In short, these procedures are common to the entire class, and the question of whether the procedures are "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates" is also a question that is common to all members of the class. 15 U.S.C. § 1681e(b).

In addition, common questions of fact exist among the members of the putative class because all members would have had a ChexSystems report sent to a third-party inaccurately listing a discharged debt. In other words, the entire class is alleged to have suffered the same injury. The members of the class should be able to show that their respective reports are inaccurate by cross-referencing their ChexSystems reports with the publicly available bankruptcy data drawn from PACER, as Riddick's expert Jonathan Jaffe did in his report. *See* Dkt. No. 101-1. This analysis resembles the Court's decision in *Soutter*, where plaintiffs alleged that a CRA inaccurately

reported that consumers had adverse court judgments entered against them. 307 F.R.D. at 194–95. The court in *Soutter* reasoned that commonality existed because "[t]he inaccuracy at issue . . . involves one variable that is inaccurate in a common manner across the class and is easily verifiable by reference to a single court-run database without resorting to complex mini-trials." *Id.* at 201 (citation modified). The same reasoning applies here. The putative class members can readily verify the accuracy of their ChexSystems reports by referencing federal bankruptcy court data to show whether a debt listed in the report has been discharged. This shared question of fact regarding the alleged inaccuracy of the class members' reports and the shared method of proof satisfy the commonality prong.

Accordingly, commonality exists for the proposed class.

3. Typicality and Adequacy

To certify Riddick's proposed class, the Court must find that Riddick's claims are typical of the class, Fed. R. Civ. P. 23(a)(3), and that Riddick would be an adequate representative for the class, Fed. R. Civ. P. 23(a)(4). "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff[s], so go the claims of the class.'" *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (citation omitted). "Typicality requires that the claims of the named class representatives be typical of those of the class; 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" *Lienhart v. Dryvit Sys.*, 255 F.3d 138, 146 (4th Cir. 2001) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)). "Typicality tends to merge with the adequacy of representation requirement which looks for conflicts of interest between named parties and the class members." *CareFirst of Md. v. Johnson & Johnson*, No. 2:23-cv-629, 2025 WL 3497098, at *3 (E.D. Va. Dec.

5, 2025) (citation modified). ChexSystems focuses much of its opposition on the typicality and adequacy requirements, and the Court will address those arguments in turn.

*a. Riddick is a Member of the Class*

ChexSystems primarily argues that Riddick is neither typical nor adequate because she is not actually a member of the proposed class. *See* Dkt. No. 110, at 18–26. ChexSystems argues that Riddick is not "the subject of a consumer report furnished by [ChexSystems] . . . where the report indicated an outstanding balance or a past due indication on an account existing on the date [she] filed a Chapter 7 bankruptcy." Dkt. No. 110, at 19; Dkt. No. 97, at 8. ChexSystems alleges that Riddick's report "did not show that her Account had an unpaid balance that existed prior to the date [Riddick] filed for Chapter 7" because Riddick filed for Chapter 7 bankruptcy on June 17, 2019, while her report indicates that her account had closed about a month later on July 12, 2019. Dkt. No. 110, at 20 (citation modified). According to ChexSystems, Riddick is not part of her own purported class because her report showed only that her account was closed after she filed for Chapter 7 bankruptcy, not that the account was owing at the time Riddick filed for bankruptcy. *Id.* at 19; *see* Dkt. No. 97, at 8 (defining Riddick's proposed class). ChexSystems goes on to argue that it is not even clear that the SunTrust account was in fact discharged given that it appears the debt arose after Riddick filed for bankruptcy. Dkt. No. 110, at 20.

Riddick acknowledges that the QualiFile report notes only that her account was closed in July 2019 but argues that "[t]he closure in July 2019 was SunTrust charging off and reporting an account that pre-existed" Riddick's conversion to Chapter 7 and that "[a] charge-off typically occurs six months after account delinquency." Dkt. No. 156, at 10–11. In another pleading, Riddick states that "[a]n account charged off in July 2019 necessarily existed on June 17, 2019. And

[Riddick] attested in discovery that she did not pay the SunTrust charge-off because it was included in her Chapter 7 bankruptcy and discharged in September 2019." Dkt. No. 107, at 13.

The Court finds that Riddick is a member of the class. First, it is undisputed that Riddick is the subject of a consumer report furnished by ChexSystems to a third-party within two years of the filing of this lawsuit. Second, the report about Riddick indicated that there was an outstanding debt on her SunTrust account and, based on Riddick's bankruptcy filings, both the SunTrust account and the debt existed at the time she converted from a Chapter 13 proceeding to a Chapter 7 proceeding. *See* Dkt. Nos. 110-16, 110-18, at 11; *In re Riddick*, No. 17-72638, Dkt. Nos. 27, at 5, 27-1 (Bankr. E.D. Va.). A Discharge Order was entered in Riddick's bankruptcy case, and a copy of that order was sent to SunTrust. Dkt. No. 110-13, at 4. Consequently, Riddick's debt from her SunTrust account was discharged by the bankruptcy court's Discharge Order because "[d]ebts incurred between the date of the filing of the petition [for a Chapter 13 proceeding] and the date of conversion to Chapter 7 are treated as if they were prepetition debts, and can be included in the discharge if one is granted." 4 *Collier Bankruptcy Practice Guide* ¶ 75.04 (2026); *see also In re Sheets*, No. 12–31723, 2014 WL 4831339, at *2 (Bankr. E.D. Va. Sept. 29, 2014) ("A claim against a debtor that arises after the order for relief entered upon the petition date but before the conversion date in a case that is converted under 11 U.S.C. § 1307 is treated as if the claim had arisen immediately before the date of the filing of the petition."). And, finally, Riddick's debt to SunTrust was not subject to a reaffirmation agreement nor has there been an adversary proceeding associated with the SunTrust debt. *See In re Riddick*, No. 17-72638, Dkt. No. 42 (Bankr. E.D. Va. Sept. 27, 2019). Therefore, Riddick is a member of the proposed class.

*b. Many of ChexSystems's Arguments Address the Merits of the Case*

ChexSystems also argues that Riddick is not typical of the class because her proposed solution of "scrubbing" publicly available bankruptcy records and comparing this information with ChexSystems's internal data would not have actually made a difference to Riddick here. Dkt. No. 110, at 21–22. ChexSystems alleges that it could not have discovered that Riddick's underlying debt accrued prior to her Chapter 7 conversion given that the only information concerning Riddick's SunTrust account that it possessed was the account closure date of July 2019. *Id.* In addition, ChexSystems contends that based on the information that was available to it, nothing would have shown that Riddick's underlying debt was actually discharged. *Id.* at 22–23. The Court finds that this argument is premature at this stage given that it addresses the merits of whether ChexSystems's procedures for receiving account information from financial institutions and reviewing potentially discharged debts are reasonable under the FCRA. *See Brown*, 785 F.3d at 903.

The same is true for ChexSystems's argument that Riddick is an atypical plaintiff given that she did not provide evidence that SunTrust was an unreliable furnisher of account information. Dkt. No. 110, at 23–24. The Court will not address this argument at this time because it focuses on the underlying merits of Riddick's claims about the reasonableness of ChexSystems's procedures.

*c. Riddick Has Standing*

ChexSystems further argues that Riddick lacks standing because her QualiFile report recommended that Chartway open her account and that Riddick has not produced admissible evidence that Chartway refused to open her account based on the misinformation in the QualiFile report. Dkt. No. 110, at 24–26. The Court disagrees. The Supreme Court of the United States and the United States Court of Appeals for the Fourth Circuit have both held that plaintiffs have

standing to pursue their FCRA reasonable-procedures claims if an inaccurate credit report was provided to a third-party that received and reviewed the report. *See Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 296 (4th Cir. 2024); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 433 (2021) ("[C]lass members whose reports were disseminated to third parties suffered a concrete injury in fact under Article III."). Chartway requested Riddick's QualiFile credit report, and ChexSystems provided the reports to Chartway stating that Riddick still owed a debt that was discharged in bankruptcy. That allegation establishes standing for Riddick's FCRA reasonable-procedures claim.

ChexSystems argues that Riddick has failed to show that she suffered any concrete harm because the QualiFile report recommended that Chartway open an account for Riddick and that the record does not show that Chartway denied her an account. Riddick disputes this by testifying under oath that Chartway denied her an account and told her that the denial was "based on the ChexSystems entry." Dkt. Nos. 156, at 13; 156-1, at 116:1–16. Even without this additional evidence, Riddick would have standing. As noted, to have standing, Riddick must show that she had an inaccurate credit report that was published to a third-party and that the third-party read and comprehended the inaccurate report. *See Fernandez*, 116 F.4th at 296. The Fourth Circuit has emphasized that a plaintiff need not "show any *additional* or *tangible* harm once a third party has read the misleading information and understood its defamatory significance." *Id.* at 297 (emphasis in original). At this stage of the proceeding, Riddick has adequately shown that she has standing because Chartway requested, received, and reviewed her inaccurate QualiFile report; Riddick is not required to show any additional harms as ChexSystems appears to suggest.

*d. Riddick is Typical of the Class and an Adequate Class Representative*

As stated above, Riddick is a member of the class and she claims the same alleged injury as the rest of the purported class: the publication of an inaccurate credit report to a third party

disclosing debt previously discharged in bankruptcy. Riddick's claim is similar to the other members of the class in that her 2024 QualiFile reports still showed that Riddick owed a debt to SunTrust even though this debt had been discharged in bankruptcy in 2019. *See* Dkt. Nos. 110-13, 110-16, 156-3. This scenario is typical of the class Riddick seeks to represent insofar as it involves members who had their reports published to third parties indicating that a debt was owed when that debt was actually discharged in bankruptcy. Accordingly, the Court finds that Riddick's interests do not conflict with the rest of the class, and that Riddick and her counsel can adequately represent the interests of the class members. Therefore, Riddick has satisfied both the typicality and adequacy requirements under Rule 23(a).

**D. Ascertainability**

In addition to the explicit requirements listed in Rule 23, the Fourth Circuit requires that the members of the proposed class be ascertainable. *See EQT Prod. Co.*, 764 F.3d at 358. "To satisfy the ascertainability requirement, the district court must be able to readily identify the class members in reference to objective criteria and it must be administratively feasible for the court [to] do so." *Davis v. Cap. One, N.A.*, No. 24-1507, 2025 WL 2445880, at *5 (4th Cir. Aug. 26, 2025) (citation modified). This means that "if class members are impossible to identify without extensive and individualized fact-finding or mini-trials, then a class action is inappropriate." *EQT Prod. Co.*, 764 F.3d at 358 (citation modified). While the plaintiff must show that the class members will be readily identifiable, "plaintiffs need not be able to identify every class member at the time of certification." *Id.*

1. Motion to Exclude Jaffe

ChexSystems has moved to exclude the expert testimony of data-analyst Jonathan Jaffe, which Riddick relies on in part to ascertain potential class members. *See* Dkt. Nos. 156, at 24, 101-

1, 201. Because Jaffe's report is critical to the analysis of whether the class members can be readily identified, the Court finds it necessary to rule on ChexSystems's Motion to Exclude Jaffe prior to addressing the ascertainability requirement.[7]

To identify potential class members, Jaffe reviewed two datasets produced by ChexSystems that represented QualiFile reports issued in 2025.[8] Dkt. No. 101-1 ¶¶ 19–26. He compared the consumer data in these reports with public information that he obtained from PACER to determine whether a consumer report within the sample would satisfy his "Bankruptcy Criteria." *Id.* ¶¶ 20, 22. A consumer's QualiFile report would satisfy Jaffe's Bankruptcy Criteria if the consumer had:

> (1) unpaid closures as of the inquiry date where the individual had a publicly filed Chapter 7 bankruptcy with a disposition of Standard Discharge, (2) either a discharge date that was prior to the inquiry date or, if a discharge date was not available through PACER, a filing date that was prior to the inquiry date, and (3) no unpaid closures with a date between the discharge date and the inquiry date.

*Id.* ¶ 22.

Jaffe opines that a particular number of consumer reports in ChexSystems's dataset satisfied the Bankruptcy Criteria. *Id.* ¶ 27 (providing exact numbers). Jaffe also states that the dataset was a representative sample of QualiFile inquiries for the relevant class period, and, based on that, he predicts that the class would include thousands of individuals. *Id.* ¶¶ 25, 29. As he

---

[7] Riddick offers Jaffe's testimony "to make two declarative statements: (1) the data exists by which to identify a numerous and ascertainable class; and (2) a mechanical process is available to ChexSystems . . . to determine whether a consumer who was subject to a ChexSystems report containing a collection tradeline has obtained a Chapter 7 bankruptcy discharge that implicated that tradeline." Dkt. No. 238, at 2. Only the first statement as to numerosity and ascertainability is relevant here. The second statement—which is relevant to the reasonableness of ChexSystems's policies—is not implicated in the pending Motion for Class Certification.

[8] Jaffe concluded that the earlier ChexSystems's dataset was not sufficiently representative and therefore focused on the later dataset. Dkt. No. 101-1 ¶ 38.

further explains, Jaffe intends to apply this same method to the rest of ChexSystems's data for the class period once the class is certified. Dkt. No. 156, at 32.

Riddick relies heavily on Jaffe's report in the Motion for Class Certification to argue that the purported class is numerous and ascertainable. Dkt. No. 97, at 11, 13. ChexSystems moves to exclude Jaffe's report and testimony under *Daubert* and Rule 702. ChexSystems does not contend that Jaffe lacks the requisite qualifications to give his opinions,[9] but raises numerous other grounds supporting exclusion. Dkt. No. 201. First, ChexSystems argues that Jaffe's report is irrelevant because the Bankruptcy Criteria do not track the language of the proposed class definition and ignore "critical distinctions such as the timing of the bankruptcy filing, whether debts were scheduled, and whether the bankruptcy was an asset case." *Id.* at 1, 6–23. Second, ChexSystems posits that Jaffe's report should be excluded because the methodology used "does not require a bankruptcy discharge to have occurred *before* ChexSystems issued a QualiFile report." *Id.* at 1, 11–15. Finally, ChexSystems moves to exclude the Jaffe report on the basis that the methodology "depends on automated PACER queries that contravene the system's operation requirements." *Id.* at 2, 23–24.

*a. Relevance to Class Definition*

ChexSystems first argues that Jaffe's analysis is not relevant to (or does not "fit") the case because the Bankruptcy Criteria are "not designed to find Plaintiff's putative class." Dkt. No. 201, at 6. According to ChexSystems, Jaffe's criteria limit the purported class both by looking at "unpaid closures" rather than more broadly at "an outstanding balance or a past due indication" as

---

[9] The Court likewise has no reason to doubt Jaffe's professional qualifications and notes that Jaffe has provided expert testimony and reports in numerous cases, including an FCRA class action where he compared consumer data with publicly available bankruptcy information queried from PACER. *See, e.g.*, *Brooks v. TransUnion LLC*, 743 F. Supp. 3d 622, 632 (E.D. Pa. 2024).

directed by the class definition, and by looking solely at QualiFile reports as opposed to other ChexSystems consumer reports. Dkt. No. 201, at 10. At the same time, ChexSystems also argues that Jaffe broadened the purported class by failing to analyze whether the individual had a reaffirmation agreement or had an account that was determined to be non-dischargeable, as required by the third element of the class definition. *Id.* ChexSystems further argues that Jaffe's criteria are unreliable because they ignore "critical distinctions" relevant to the class like the timing of the bankruptcy filing itself, whether the bankruptcy was an asset case, and whether the debt was scheduled or unscheduled. *Id.* at 1, 25–26. Because Jaffe's report and testimony thus fail to provide analysis relevant to the class case, ChexSystems contends, they should be excluded.

"The Supreme Court has explained that relevance—or what has been called 'fit'—is a precondition for the admissibility of expert testimony, in that the rules of evidence require expert opinions to assist the 'the trier of fact to understand the evidence or to determine a fact in issue.'" *United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 318 (4th Cir. 2018) (quoting *Daubert*, 509 U.S. at 591). When determining whether an expert's testimony and methodology may be relevant, the Court must focus "on the principles and methodology employed by the expert, not on the conclusions reached." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (citation modified).

Here, Jaffe's method of comparing ChexSystems's datasets with the publicly available bankruptcy records obtained from PACER is one that has previously been recognized as a viable method for ascertaining potential class members in an FCRA case. *See Brooks*, 743 F. Supp. 3d at 640–41 (crediting Jaffe's method to "support[] the proposition that searching PACER for public records of bankruptcies based on nine-digit social security numbers is a reliable and administratively feasible method for determining whether there is a government-held public record

of a bankruptcy filing by the class member within ten years of the month in which Trans Union sold a credit report”). Similar to the district court’s holding in *Brooks*, the Court concludes that Jaffe’s method employs objective criteria and relies upon reliable data.

But ChexSystems contends that even if the criteria are objective, they differ from the class definition with respect to three elements:[10] 1) the “report trigger” element requires a “consumer report furnished by Defendant to a third party,” whereas Jaffe analyzes only QualiFile reports; 2) the “account status” element requires that the report “indicated an outstanding balance or a past due indication,” whereas Jaffe uses “unpaid closures”; 3) the “account linkage to bankruptcy” element requires the “account to be existing on the date such a person filed a Chapter 7 bankruptcy,” whereas Jaffe does not verify whether the account was scheduled as a debt. *See* Dkt. Nos. 205, at 8; 238, at 16. ChexSystems also argues that Jaffe includes an additional filtering condition that excludes unpaid closures between discharge and inquiry but fails to query for reaffirmation agreements or adversary proceedings. The Court will consider each argument in turn.

With respect to the first element, Riddick alleges that the consumer report prepared by ChexSystems was provided to Chartway, Dkt. No. 16 ¶ 14, and Jaffe opines that “ChexSystems brands its consumer reports as QualiFile® Reports,” Dkt. No. 101-1 ¶ 14. ChexSystems does not argue that QualiFile reports are not consumer reports and there is no suggestion in the record that this case concerns any other consumer report beyond the QualiFile reports used by Jaffe for this criterion. Jaffe’s criterion is therefore appropriate.[11] Turning to the second element, the search criterion “unpaid disclosures” references a field within ChexSystems’s data. As Jaffe explained,

---

[10] ChexSystems also took issue with the fact that Jaffe limited his criteria to Chapter 7 only. That argument is moot given the Court’s ruling on the class definition.

[11] Should there be some need to distinguish the QualiFile reports from some other consumer report prepared by ChexSystems, a modification to the class definition would be appropriate.

he reviewed the "raw" data associated with Riddick's QualiFile report and identified fields that embodied the allegations in this case. *See* Dkt. 101-1 ¶¶ 16, 18, 20. Based on the appearance of "unpaid closures" in one of Riddick's fields, Plaintiff's counsel directed Jaffe to query this same information in ChexSystems's data to capture accounts that embodied the class element "where the report indicated an outstanding balance or a past due indication on an account." *See id.* ¶ 22. ChexSystems does not argue that this selection unfairly changes the class definition, and the Court concludes the differences are insignificant. As to the third element, Jaffe explained in his rebuttal report that an additional parameter can be added to his automated method through a documented Chrome-based extension at a four- to five-second per-filing rate, and that this parameter would verify whether the specific account reported on the ChexSystems report was specifically scheduled as a debt in the individual's bankruptcy filing. Dkt. 160-1 ¶¶ 14–15. This addition adequately addresses ChexSystems's objection to this criterion.

ChexSystems's remaining challenges fail for similar reasons. Jaffe's inclusion of an additional filtering condition (excluding unpaid closures that occurred between discharge and inquiry) appears to have been included so that debts which are not discharged (because they arose after the discharge order) are not included. This is entirely consistent with the class definition and applicable bankruptcy law. *See* 11 U.S.C. § 524 (effect of discharge). As to the "critical distinctions" ChexSystems identifies as missing from the Bankruptcy Criteria, Jaffe's rebuttal report explains that he is able to modify his process to identify any reaffirmation agreements or adversary proceedings, as well as identify and distinguish asset-based bankruptcies from no-asset bankruptcies. Dkt. 160-1 ¶¶ 16–22.

Ultimately, the fact that Jaffe's chosen search parameters do not perfectly align with the class definition is not a ground to entirely strike his testimony or report. *See Westberry*, 178 F.3d

at 261. At bottom, Jaffe's report reflects the use of a reliable method for identifying class members, is capable of being adjusted, and, even if the criteria do not perfectly align with the class definition, they are a close approximation of the class definition. The Court finds Jaffe's methodology provides a relevant and reliable analysis to ascertain potential class members.

*b. Methodology Includes ChexSystems Reports Created Before Discharge*

ChexSystems next argues that Jaffe's report and anticipated testimony is neither relevant to the case nor reliable. The core contention here is that Jaffe's methodology includes individuals in the purported class who had a ChexSystems report created *after* the individual filed for bankruptcy but *before* a discharge order was entered. Dkt. No. 201, at 11–15. As ChexSystems notes, this is problematic because individuals who were the subject of a ChexSystems report before a discharge order likely have no claim. Importantly, though, Jaffe's criterion focuses on the proper group—individuals who were the subject of a ChexSystems report after a discharge order. The criterion requires "either a discharge date that was prior to the inquiry date or, if a discharge date was not available through PACER, a filing date that was prior to the inquiry date." Dkt. 101-1 ¶ 22. Although the criterion prioritizes the proper inquiry, it does allow for the filing date to be used. For reasons that are unclear to the Court, under Jaffe's method, about 42% of the purported class members from the dataset did not have their respective debts discharged until after ChexSystems provided the QualiFile reports to third party businesses. Dkt. No. 201, at 17. ChexSystems argues that Jaffe's choice of criterion is disqualifying because nearly half of the individuals it captures are not class members. *Id.* at 17–18. Such a critique cannot be overlooked, but it can be overstated. However significant, this flaw does not warrant a wholesale exclusion of Jaffe's report and testimony because his methodology remains capable of ascertaining, at a minimum, a majority of the class members.

For class members to be ascertainable, they must be readily identifiable through objective criteria. At this stage, all that is required of these "objective criteria" is that they are "capable of answering the who's-in-and-who's-out question later in the litigation." *Morrow v. Navy Fed. Credit Union*, No. 1:21-cv-0722, 2023 WL 2874908, at *5 (E.D. Va. Apr. 6, 2023); *see also Krakauer v. Dish Network, LLC*, 925 F.3d 643, 658 (4th Cir. 2019) (explaining that while plaintiffs need not "identify every class member at the time of certification," they are required to show that "at some point" there will be some "administratively feasible" method of determining whether a particular individual is a member). As it stands, 58% of the purported class identified by Jaffe would have a claim in this case. *See Davis*, 2025 WL 2445880, at *5 (explaining that a "75 percent" misidentification of potential class members constituted a "high error rate" that "weigh[ed] heavily against the admissibility of [the] expert['s] opinion"). And importantly, ChexSystems's argument (in which it is able to objectively identify the 42% percent) makes clear that identifying individuals who are *not* part of the class is possible with additional review that does not appear to require "extensive and individualized fact-finding." *Morrow*, 2023 WL 2874908, at *5. As such, the Court will not exclude Jaffe's report on the basis that he chose to rely on criteria that could have potentially expanded the size of the purported class.

*c. PACER's Potential Limitations*

Finally, ChexSystems argues that Jaffe's method is unreliable because "it depends on bulk PACER queries that are contrary to the system's operational requirements" and that "PACER is not built to handle the queries he proposes." Dkt. No. 201, at 23. ChexSystems's argument is supported by one of its experts, David Kalat. *See* Dkt. No. 114-7 ¶¶ 50–57. In response, Jaffe explains why he believes the PACER system will allow the volume of searches necessary to his method. Dkt. No. 160-1 ¶¶ 23–29.

The Court is satisfied that at this point Jaffe's method is sufficiently reliable for purposes of class certification. As discussed above, Jaffe's method of comparing ChexSystems's datasets with the publicly available bankruptcy records obtained from PACER has previously been recognized as a workable method for ascertaining potential class members in an FCRA case. *See Brooks*, 743 F. Supp. 3d at 640–41. Going forward, if it becomes evident that Jaffe is unable to ascertain the class, the Court can reconsider this decision. *See In re Titanium Dioxide Antitrust Litig.*. 962 F. Supp. 2d 840, 861 (D. Md. 2013) (explaining that a district court has "broad discretion in determining whether to modify or even decertify a class"). Indeed, under Rule 23, if Jaffe's method proves unworkable, this Court has an obligation to "define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts." *Id.* (citing *Richardson v. Byrd,* 709 F.2d 1016, 1019 (5th Cir.1983)); *see also Chisholm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 544 (E.D. Va. 2000) ("Even after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation." (quoting *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160 (1982)).

In conclusion, Jaffe's method for ascertaining potential class members rests on reliable and valid principles. Therefore, ChexSystems's Motion to Exclude Jaffe, Dkt. No. 200, is DENIED IN PART.[12]

---

12 The Court notes that the parties have other pending *Daubert* motions targeting other experts in the case. Dkt. Nos. 196, 198, 207, 213. The Court will not rule on the remaining *Daubert* motions in this Order given that these reports are not essential to the Court's analysis in determining whether the class can be certified. Similarly, the Court does not address the portion of ChexSystems's Motion to Exclude Jaffe relevant to his opinions on the reasonableness of ChexSystems's policies.

2. The Class is Ascertainable

Taking Jaffe's report into consideration, the Court finds that when comparing ChexSystems's internal records (such as those provided in the datasets) with the publicly available information taken from PACER, the class members are readily identifiable based on the following objective criteria: (1) they were the subject of a ChexSystems report that was furnished to a third-party within two years of the filing date of this action; (2) they filed for Chapter 7 bankruptcy; (3) their report indicates a debt that arose on an account that pre-existed the Chapter 7 bankruptcy filing; (4) their bankruptcy resulted in the entry of a Discharge Order for the reported debt; (5) the debt was not subject to a reaffirmation agreement making the account enforceable notwithstanding the discharge; and (6) the debt was not subject to an adversary proceeding in which the debt was determined to be non-dischargeable.

As discussed above, Jaffe's methodology uses an automated procedure to ascertain the majority of class members. Jaffe's method can add an additional automated step to identify reaffirmation agreements and adversary proceedings—both of which are uncommon in traditional Chapter 7 bankruptcies. *See* Dkt. No. 160-1 ¶¶ 15–19. This automated process is based on Jaffe's method, and these individuals would clearly meet the class definition without any individual analysis.

For individuals whose debts arose pre-conversion or pre-petition, but whose accounts were closed between the filing of their petition but before discharge (such as Riddick herself), counsel can manually review the publicly available bankruptcy records from PACER to determine whether those individuals meet the class definition. *See Soutter*, 307 F.R.D. at 197 ("The number of steps in the process and the time and effort required have no bearing on whether the individuals are or are not objectively ascertainable." (citation modified)). As Riddick's expert David Cox notes,

counsel can manually review a debtor's Discharge Order to determine whether a pre-petition debt is listed as being discharged. Dkt. No. 97-6, at 8. The docket would also show whether an adversary proceeding or a reaffirmation agreement placed the discharge of the debt into question. *Id.*

In sum, the class can be ascertained in an administratively feasible manner by identifying the majority of the class using Jaffe's automated method of comparing ChexSystems's datasets with the Bankruptcy Criteria. Then, for the remaining individuals who are flagged as potentially being in the class (but need individualized review), a manual review of public bankruptcy filings can identify which debts were in fact discharged in bankruptcy. The need for additional manual review of public records does not itself render Jaffe's method unreliable nor does it imply that ascertaining the class is somehow administratively infeasible. *See Kelly v. RealPage Inc.*, 47 F.4th 202, 224 (3d Cir. 2022) ("[A] straightforward 'yes-or-no' review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources" (citation modified)). Accordingly, the Court finds that the ascertainability requirement is met.

**E. Rule 23(b)(3)**

Riddick moves to certify her class under Rule 23(b)(3). A court may only certify a class under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

1. Predominance

"Rule 23(b)(3)'s predominance requirement is 'far more demanding' than Rule 23(a)'s commonality requirement and 'tests whether proposed classes are sufficiently cohesive to warrant

adjudication by representation.'" *Gariety*, 368 F.3d at 362 (quoting *Amchem*, 521 U.S. at 623–24). In other words, "the Rule 23 inquiry does not end upon the identification of a common question alone." *Stafford*, 123 F.4th at 679. The common contention "must [also] predominate over all other individualized issues." *Id.* "Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." *Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 273 (4th Cir. 2010). Where "common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." *Id.* (quoting *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003)) (citation modified).

As discussed in the commonality section, the Court finds that the class shares common legal and factual questions because they all share the same alleged injury of having inaccurate reports shared with third parties and all members would argue that ChexSystems failed to implement reasonable procedures to prevent the release of that incorrect information. In response, ChexSystems contends that various individual issues predominate these common issues, and therefore class certification is inappropriate under Rule 23(b)(3). The Court addresses each argument in turn below.

*a. Potential Individual Questions in a Bankruptcy Discharge*

ChexSystems first asserts that "determining discharge requires an individual review of each consumer's circumstances" that would predominate the common questions to the class. Dkt. No. 110, at 29. The only way in which someone can objectively verify that a debt was actually discharged in bankruptcy, ChexSystems contends, would be by manually reviewing each consumer's bankruptcy filings. *Id.* The Court finds that this concern, however, is mitigated by Jaffe's expert report which shows how an eligible account can be identified by comparing ChexSystems's own datasets with publicly available PACER information. If the debt appears in a

publicly available Discharge Order, then the debt was discharged in bankruptcy, and it would be inaccurate to continue listing such a debt as being owed.

Although there may be instances where further review is required to confirm whether the debt was actually discharged (such as when PACER shows the existence of a reaffirmation agreement), the Fourth Circuit has stated that "common issues of liability may still predominate even when some individualized inquiry is required." *Ealy*, 514 F. App'x at 305. As discussed in the ascertainability section, most of the class members can be ascertained through Jaffe's automated process, and a few exceptions would require further inquiry to see whether a particular debt was subject to a reaffirmation agreement, adversary proceeding, or was objected to for some other reason. The fact that some class members may require further review does not imply that those instances predominate the overarching common questions of the class.

*b. Issues Concerning Class-wide Injuries*

ChexSystems also argues that individual issues concerning the class's respective injuries-in-fact would predominate over the common questions. For instance, ChexSystems argues that Riddick has not put forth evidence of class-wide missed banking opportunities or class-wide reputational harm that resulted from an inaccurate consumer report. Dkt. No. 110, at 32–35. As discussed in the typicality section, both the Supreme Court and the Fourth Circuit have held that a consumer has standing to bring an 18 U.S.C. § 1681e(b) claim if they were the subject of a credit report containing incorrect information about them that was provided to and reviewed by a third-party. *See Fernandez*, 116 F.4th at 295–96; *TransUnion LLC*, 594 U.S. at 433. Accordingly, so long as the class members fit the class definition, they would have a claim regardless of whether they lost other banking opportunities or even suffered other reputational harms. *See Fernandez*, 116 F.4th at 297.

*c. Reasonable Procedures for Furnishing Institutions*

ChexSystems also contends that class-wide adjudication is inapplicable because Riddick would need to prove that each bank that furnishes information to ChexSystems is an unreliable source of bankruptcy information and that she would need to prove facts specific to each of the potentially hundreds of furnishing institutions. Dkt. No. 110, at 35–37. This argument misses the forest for the trees. Here, Riddick's theory of the case—that ChexSystems should have implemented a process to independently review bankruptcy records—will be countered by ChexSystems's theory that relying on furnishing institutions and a "robust furnisher credentialing process" is a reasonable procedure to assure maximum possible accuracy. The focus of this disagreement is not on the reliability of an any one furnisher, but rather on ChexSystems's policies, which it generically implemented across all consumers. As such, while some inquiry into individual furnishers may be necessary, the Court finds that issues concerning the individual furnishing institutions do not predominate over the common question of whether ChexSystems's policies are reasonable to assure maximum possible accuracy.

*d. Potential Defenses for Eighth Circuit Class Members*

ChexSystems argues that the Court cannot certify a nationwide class because the United States Court of Appeals for the Eighth Circuit has held that, absent sufficient notice, "a CRA is not required to preemptively check PACER before publishing a report, even if the CRA was aware of [a bankruptcy] discharge." Dkt. No. 110, at 37–38 (citing *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1109 (8th Cir. 2022)). This potential defense for one jurisdiction, however, does not justify denying certification for the entire class.[13] "Although a defense may arise and may affect

[13] The parties' treatment of this issue is brief; ChexSystems's argument is made in approximately one page, Dkt. No. 110, at 37–38, while Plaintiff's response is just one paragraph, Dkt. No. 156, at 22. Neither party cites any law beyond *Rydholm*. ChexSystems argues that

different class members differently, this does not compel a finding that individual issues predominate over common ones." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010) (citation modified). Variations in the application of a specific defense to a portion of the class will not automatically create individualized issues for the remainder of the class so long as the crux of the case centers on the common issues shared by the class members. *See id.* Here, the common issues concerning the accuracy of ChexSystems's reports and the reasonableness of its procedures are common to all class members. At present, it is unclear how many Eighth Circuit members comprise the class, and the Court cannot find that the potential defenses to these members' claims would predominate the overarching common issues identified. If the Court determines later that a sub-class of Eighth Circuit members is required, then the Court can certainly set those members apart. *See* Fed. R. Civ. P. 23(c)(5).

*e. Class-wide Willful Violation*

Finally, ChexSystems argues that the determination of whether it acted willfully will necessarily rest on individualized evidence. Dkt. No. 110, at 38–39. This argument similarly fails given that this case concerns the reasonableness of ChexSystems's policy to rely on its furnishing institutions as opposed to independently conducting its own assessment of bankruptcy filings. Whether the implementation of this policy constituted a willful violation of FCRA § 1681e(b), then, is a class-wide question. *See Berry v. LexisNexis Risk & Info. Analytics Grp.*, No. 3:11-cv-754, 2014 WL 4403524, at * 13 (E.D. Va. Sept. 5, 2014), *aff'd sub nom. Berry v. Schulman*, 807

---

*Rydholm* "provides a complete defense," presumably under the reasoning that ChexSystems was entitled to rely on *Rydholm* in its compliance with the FCRA. Dkt. No. 110, at 38. Plaintiff points out that the FCRA is a federal statute which establishes "the same federal standard in every jurisdiction," seemingly arguing, without further elaboration, that the *Rydholm* defense would not apply. Dkt. No. 156, at 22. The Court need not wade into this undeveloped argument and will assume, for purposes of this motion, that a defense exists relevant to certain class members.

F.3d 600 (4th Cir. 2015). Because this is a commonality shared by all members of the putative class, the Court is satisfied that the class meets the predominance requirement.

2. Superiority

Turning to Rule 23(b)(3)'s superiority prong, the proposed class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In analyzing superiority, the Court considers the following four factors: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D). Fundamentally, this inquiry requires the Court "to find that the objectives of the class-action procedure really will be achieved in the particular case." *Stillmock*, 385 F. App'x at 274 (quoting 7AA Wright & Miller's *Federal Practice & Procedure* § 1779 (3d ed. 2005)).

Here, the Court finds that class-wide adjudication will achieve the objectives of class litigation. "The advantage of the class action device has frequently been recognized in situations where it enables persons with claims of small individual injuries to pool their resources to wage a fight to vindicate their rights." *Brown v. Cameron-Brown Co.*, 92 F.R.D. 32, 49–50 (E.D. Va. 1981). The potential damages for each individual class member in this case are relatively small, especially compared to the costs of litigating their claims individually. In addition, if class-wide adjudication were not permitted, a large number of potentially meritorious plaintiffs would never actually bring their claim in the first place. *See Soutter*, 307 F.R.D. at 218 (explaining that "there is a strong presumption in favor of a finding of superiority where, as here, the alternative to a class action is likely to be no action at all for the majority of class members" (citation modified)). Class-wide

adjudication is the superior method for litigating this claim under Rule 23(b)(3), and the Court finds that the class thus meets all of Rule 23(b)(3)'s requirements.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Riddick's Motion to Amend her Complaint. Dkt. No. 94. The Court also finds that Riddick has satisfied Rule 23's class certification requirements with respect to her revised class definition. The Court therefore GRANTS IN PART AND DENIES IN PART Riddick's Motion to Certify Class. Dkt. No. 96. The Court also DENIES IN PART ChexSystems's Motion to Exclude Expert Jonathan Jaffe. Dkt. No. 200. An appropriate order shall issue certifying the class, appointing the class representative and class counsel, and providing direction to the parties with respect to the class notice form.

/s/
Elizabeth W. Hanes
United States District Judge

Norfolk, Virginia
Date: September 30, 2026

**Case No. ___**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

CHEX SYSTEMS, INC.,

Defendant-Petitioner,

v.

SHARON K. RIDDICK,
on behalf of herself and all others similarly situated,

Plaintiff-Respondent,

---

On Appeal from the United States District Court for the
Eastern District of Virginia, Norfolk Division, No. 2:24-cv-700

---

**DEFENDANT'S PETITION FOR LEAVE TO APPEAL CLASS CERTIFICATION ORDER PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)**

---

**EXHIBIT 2**

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** ____________ **Caption:** Sharon K. Riddick v. Chex Systems, Inc.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

- [✓] this brief or other document contains 5,190 [*state number of*] words
- [✓] this brief uses monospaced type and contains 458 [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

- [✓] this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word [*identify word processing program*] in Times New Roman,14-pt, Serif [*identify font, size, and type style*];

**or**

- [ ] this brief or other document has been prepared in a monospaced typeface using ____________ [*identify word processing program*] in ____________ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) David M. Gettings

Party Name Chex Systems, Inc. Date: 10/14/26